**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| TARA ARTHUR | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. |
| v. | ) |
| | ) |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY | ) ) |
| | ) |
| Defendant. | ) |

**COMPLAINT**

Plaintiff Tara Arthur, by and through her attorneys, Hart McLaughlin & Eldridge, LLC, and Ben Crump Law, states as follows for ger Complaint against State Farm Mutual Automobile Insurance Company ("State Farm"):

**INTRODUCTION**

1. Tara Arthur is an African American woman who had worked in the insurance industry for over eight years.

2. After joining State Farm in 2012, Tara Arthur confronted State Farm's culture of racism, discrimination, and harassment which continued throughout the course of her career there.

3. In July of 2018, Tara Arthur joined as a member of the support staff for State Farm's Claim's Litigation Counsel in Atlanta, Georgia (hereinafter referred to as "Atlanta CLC"), where Tara Arthur experienced racial harassment and discrimination from her immediate supervisor, Office Manager Phyllis Aycock.

4. Beginning in December of 2018, Tara Arthur noticed that her supervisor would not fully depict her successes in her performance reviews leading to her lack of growth and advancement at State Farm.

5. After raising her concerns that her lack of professional growth and advancement at State Farm was specifically due to her race, she was inexplicably and without warning terminated by State Farm for the baseless reason of working 50 hours "off the clock."

## JURISDICTION AND VENUE

6. In March of 2021, Tara Arthur filed a Charge of Discrimination with the Unites States Equal Employment Opportunity Commission ("E.E.O.C.").

7. After a period of delays due, in part, to COVID-19, the E.E.O.C. scheduled a mediation between Tara Arthur and State Farm to occur on December 21, 2022.

8. The mediation was unsuccessful.

9. On December 30, 2022, Tara Arthur requested a Right to Sue letter through the E.E.O.C's online portal.

10. On March 1, 2023, Tara Arthur emailed the E.E.O.C's mediator for an update on the status of her Right to Sue letter.

11. On March 6, 2023, the E.E.O.C's mediator directed Tara Arthur to the Administrative Assistant to Enforcement Supervisor.

12. On March 17, 2023, Tara Arthur emailed the E.E.O.C. again to request an update on the status of her Right to Sue Letter.

13. A Notice of Right to Sue letter was received by Tara Arthur that was signed by the District Director of the E.E.O.C. on March 09, 2023.

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action involved federal questions regarding the deprivation of Plaintiff's rights under 42 U.S.C. § 2000e and 42 U.S.C. § 1981.

15. This Court has personal jurisdiction over the Defendant because the Defendant has its principal place of business within this jurisdiction.

16. Venue is proper in this jurisdiction under 42 U.S.C. § 2000e-5(f)(3) because Defendant's unlawful employment practice was committed in this judicial district, and the employment records relevant to their unlawful practices are maintained and administered in this judicial district. Alternatively, Defendant's principal office is within this judicial district.

**PARTIES**

17. Tara Arthur is an African American woman, and a former employee of State Farm.

18. At all relevant times, Tara Arthur was employed by State Farm in the Atlanta, Georgia office.

19. State Farm is a large group of insurance companies throughout the United Stated, including Georgia, with its corporate headquarters in Bloomington, Illinois, in the Central District of Illinois.

20. Defendant's headquarters and principal office in Bloomington, Illinois maintains and administers relevant employment records, including individual

3

employee employment records, manager employment records, employee handbooks, discrimination and harassment policies, and discrimination and harassment investigation materials.

21.     State Farm is an employer as defined by Title VII of the Civil Rights Act of 1964 and was, at all relevant times to this complaint, Tara Arthur's employer.

## BACKGROUND

22.     On or around June of 2012, Tara Arthur began her employment with State Farm in an Administrative Support Position.

23.     Through her tenure at State Farm, Tara Arthur worked on a wide variety of projects including assisting with the development of the new licensing department to reviewing the continuing education and renewals of over 175 State Farm associates.

24.     From the date that she was hired through her termination, Tara Arthur's job performance was consistently complimented and lauded by her supervisors and peers.

25.     In 2016, Tara Arthur received an ovation for her commitment to ensuring State Farm's claim handlers remained in compliance and that State Farm's licensing solutions were clear and accurate.

26.     In 2017, Tara Arthur received an "On the Spot Award" for leading the revamping of the design of the weekly renewal report and 30-day report.

27.     In April of 2018, Tara Arthur was highlighted in the analyst report for her work on her 20-day renewal tab.

28. In July of 2018, Tara Arthur joined State Farm's Atlanta CLC as an Administrative Support Staff.

29. In November of 2018, her then manager reviewed her performance and concluded that Tara Arthur "has been a great asset" to Atlanta CLC.

30. In December of 2018, Tara Arthur was awarded Employee of the Month.

31. For her performance through 2018, Tara Arthur received the highest possible review score of R3C3.

32. From 2012 through 2019, Tara Arthur sought to further her employment at State Farm and pursued additional education through internal programs, such as State Farm University, and external education towards an MBA.

33. In addition, Tara Arthur also sought to improve the work environment of her colleagues through her active membership on State Farm's Diversity and Inclusion Committee.

34. In January of 2019, Tara Arthur emailed Andrea Sinnott a Compensation Analyst for State Farm about the fact that her compensation and promotions were neither fair nor reflective of the work product that she provided to State Farm.

35. In addition to fulfilling her job duties required of her position, she was also completing a number of job functions, tasks, and assignments that are generally reserved for paralegals, despite not receiving the same compensation.

36. Beginning in or around June of 2019, Phyllis Aycock became the Office Manager of the Administrative Support Staff, which included supervising those employees including Tara Arthur, at Atlanta CLC.

37. Tara Arthur was subjected to discrimination, harassment, and a hostile work environment by Office Manager Phyliss Aycock.

38. While on Office Manager Phyllis Aycock's team, Tara Arthur was required to complete not only her own job requirements but also to assist with backlog and perform the job duties of a paralegal.

39. In November of 2019, Tara Arthur once again reiterated her desire for career advancement at State Farm during her one-on-one meeting with her Office Manager Phyllis Aycock.

40. In response, Team Manager Phyllis Aycock informed Tara Arthur that only one person at a time could be in a developmental role that progresses from secretary to paralegal.

41. Soon after that one-on-one meeting, a Caucasian woman with no experience working at State Farm and with lesser professional qualifications was hired for a temporary work assignment ("TWA") for a secretary position.

42. Tara Arthur and other African American employees who had worked at State Farm for a year or more and expressed interest in that position were passed over for the lesser qualified Caucasian woman.

43. When an African American was offered and accepted a TWA for a secretary position his or her assignment was continuously and repeatedly extended

from six months to a year, whereas the Caucasian woman was officially offered the secretary role after less than six months in her TWA as a secretary.

44.   In response to State Farm holding equal or more qualified African Americans to different standards than Caucasians, State Farm informed those African Americans to not question State Farm's decisions to promote Caucasians ahead of African Americans.

45.   From the time that Office Manager Phyllis Aycock entered her role, she stifled Tara Arthur's and other African Americans' ability to grow through training and support.

46.   Office Manger Phyllis Aycock reduced Tara Arthur to feeling restricted to the lowest form.

47.   Office Manger Phyllis Aycock allowed Caucasians to climb the corporate ladder and when an African American like Tara Arthur reached for it, Office Manger Phyllis Aycock would pull it up.

48.   In doing so, Office Manager Phyllis Aycock prevented Tara Arthur from going above and beyond and exceeding expectations, which were necessary to advance at State Farm.

49.   On one occasion, Tara Arthur, who was on the mentoring and development committee, did a presentation for her colleagues on how to sign up for a mentor.

50.   Tara Arthur wanted a mentor, but Office Manager Phyllis Aycock refused to allow her to sign up for one.

51. On another occasion, Office Manager Phyllis Aycock penalized Tara Arthur for her work performance because Tara Arthur took paid time off or protected leave.

52. That action was directly contrary to State Farm's Policies, which prohibited factoring protected leave into an employee's performance.

53. After Tara Arthur confronted Team Manager Phyllis Aycock with her breach of State Farm's Policies, Team Manager Phyllis Aycock started to look for a reason to get rid of her.

54. In March of 2020, Tara Arthur once again was awarded Employee of the Month.

55. On April 24, 2020, Lynn Leonard, the Managing Attorney at Atlanta CLC, instructed the support staff to not sign out or enter any time if they step away from work for less than twenty minutes and to record time away for greater than 20 minutes and lunch breaks.

56. On April 27, 2020, Lynn Leonard informed them that "each employee not withstanding their role in the office – has flexibility to work the hours that benefit their personal situation <u>as long as the work is completed</u>."

57. With these policies and procedures that were put in place in response to the COVID-19 Pandemic, Office Manager Phyllis Aycock saw an opportunity to terminate Tara Arthur.

58. On September 2, 2020, Team Manager Phyllis Aycock, the office Manager of the Paralegals, Josetta Green, and Lynn Leonard called Tara Arthur to discuss reports that showed Tara Arthur working off the clock.

59. State Farm reviewed Tara Arthur's timecards and legal files dates and time stamps which are not reliable indicators of when someone is working, to conclude that from June through August Tara Arthur worked 50 hours off the clock.

60. In compliance with State Farm's Policies, Tara Arthur submitted her timecard to Office Manager Phyllis Aycock on a bi-weekly basis.

61. On every occasion Office Manager Phyllis Aycock approved Tara Arthur's timecards.

62. On September 9, 2020, Office Manager Phyllis Aycock called Tara Arthur to inform her that she would have to be compensated for allegedly working 50 hours off the clock.

63. On September 14, 2020, Office Manager Phyllis Aycock sent a meeting invite to Tara Arthur for September 15, 2020 for a follow-up meeting.

64. On September 15, 2020, HR Representative Cynthia Lloyd, Lynn Leonard, and Office Manager Phyllis Aycock called Tara Arthur to terminate her for working off the clock and violating the Pay Policy/Timecard Policy.

65. Instead of opting for a warning, progressive discipline, or writing her up, Office Manager Phyllis Aycock terminated her.

66. Tara Arthur worked for State Farm for eight years and never had a single disciplinary mark against her.

67. At no time prior to September of 2020 did anyone at State Farm, including Office Manager Phyllis Aycock, inform Tara Arthur that she was working off the clock.

68. Tara Arthur did not work 50 hours off the clock.

69. From the date that Office Manager Phyllis Aycock assumed her position, she would belittle Tara Arthur, attack her, and assign her a heavier workload compared to her Caucasian and non-African American teammates.

70. Office Manager Phyllis Aycock would select Caucasian staff members for special projects, provide them more favorable reviews, reduce their work loads, and give them preferential treatment.

71. For Tara Arthur and the majority of her African American coworkers, Office Manager Phyllis Aycock would subject them to micromanagement, excessive performance monitoring, disproportionate punishment, and a glass ceiling on their growth.

72. As a direct result of Office Manager Phyllis Aycock's abuse of authority and discrimination, Tara Arthur was prevented from developing, exceling, and advancing her career.

73. Tara Arthur has suffered significant monetary loss, emotional distress and mental anguish as a result of Office Manager Phyllis Aycock's discriminatory, harassing, and retaliatory conduct.

**COUNT 1**
**Title VII, 42 U.S.C. § 2000(e), et seq.**
**Discrimination, Harassment, and Hostile Work Environment Claim**

74. Each of the foregoing paragraphs are incorporated herein as if fully restated.

75. As an African American, Tara Arthur is a member of a protected class.

76. As described above, State Farm's conduct towards Tara Arthur was discriminatory and occurred because of and based upon her race.

77. State Farm's conduct occurred over several months, constituting a continuing course of discrimination towards Plaintiff.

78. State Farm committed an unlawful employment practice by treating Plaintiff differently because of her race, causing a change in the condition of her employment and subjecting her to a hostile work environment.

79. Plaintiff was subjected to a racially discriminatory environment that was both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that Plaintiff in fact did perceive to be so.

80. State Farm's conduct had the purpose or effect of unreasonably interfering with Plaintiff's work performance.

81. State Farm's conduct had the purpose or effect of creating an intimidating and hostile work environment.

82. State Farm's actions permeated the workplace with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive and regular to alter the conditions of Plaintiff's employment and create an abusive working environment.

83. State Farm's discriminatory conduct created a hostile work environment for Tara Arthur.

84. Plaintiff was subjected to a racially discriminatory and hostile work environment that was both objectively and subjectively offensive.

85. State Farm was aware of the racially discriminatory and hostile work environment and failed to remedy these working conditions.

86. State Farm's racist and discriminatory conduct included the adverse employment action of terminating Tara Arthur from her position.

87. State Farm willfully and intentionally subjected Tara Arthur to racial discrimination.

88. State Farm knew its actions violated Title VII or it was recklessly indifferent in that regard.

89. Defendant State Farm has therefore denied Plaintiff her rights under the Civil Rights Act of 1964 and he has suffered damages as a direct result of her rights being violated.

90. As a direct and proximate result of the foregoing, Tara Arthur has suffered, and will continue to suffer, damages including, but not limited to, loss of front and back wages, earnings, benefits, insurance premiums, emotional distress, and other damages to be determined at trial. Tara Arthur claims compensatory and punitive damages for these losses and injuries under § 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

**COUNT II**
**Civil Rights Act of 1866, 42 U.S.C. § 1981**

**Intentional Racial Discrimination and Hostile Work Environment**

91. Each of the foregoing paragraphs are incorporated herein as if fully restated.

92. As described above, State Farm's conduct towards Tara Arthur was discriminatory and occurred because of and based upon her race.

93. State Farm willfully and intentionally subjected Tara Arthur to racial discrimination.

94. State Farm knew its actions violated Section 1981 of the Civil Rights Act of 1866 or it was recklessly indifferent in that regard.

95. Defendant has therefore denied Plaintiff her rights under Section 1981 of the Civil Rights Act of 1866 and she has suffered damages as a direct result of his rights being violated.

96. As a direct and proximate result of the foregoing, Tara Arthur has suffered, and will continue to suffer, damages including, but not limited to, loss of front and back wages, earnings, benefits, insurance premiums, emotional distress, and other damages to be determined at trial. Tara Arthur claims compensatory and punitive damages for these losses and injuries under § 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Tara Arthur, by and through her attorneys, Hart McLaughlin & Eldridge, LLC, and Ben Crump Law, respectfully requests that the

Court enter an Order granting the following relief against the Defendant, State Farm Mutual Automobile Insurance Company:

    A.    Awarding Plaintiff actual damages;

    B.    Awarding Plaintiff lost wages;

    C.    Awarding Plaintiff damages for her emotional distress;

    D.    Awarding Plaintiff punitive damages;

    E.    Awarding Plaintiff his reasonable attorneys' fees and litigation costs; and

    F.    Awarding such other and further relied as the Court deems reasonable and just.

## JURY DEMAND

Plaintiff demands a trial by jury in this action on each and every one of his claims.

Dated: June 6, 2023

Respectfully Submitted,

/s/ Robert J. McLaughlin, Esq.

Robert J. McLaughlin, Esq. #6272701
Carter D. Grant, Esq. #6306058
Charles R. Vogt, Esq. #6321671
**Hart McLaughlin & Eldridge, LLC**
One South Dearborn Street, Suite 1400
Chicago, Illinois 60603
Tel: (312) 955-0545
rmclaughlin@hmelegal.com
cgrant@hmelegal.com
cvogt@hmelegal.com

Benjamin Crump,
FL Bar #72583
**BEN CRUMP LAW**
122 S. Calhoun Street
Tallahassee, Florida 32301
Tel: (800) 713-1222
<u>ben@bencrump.com</u>